UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHAWNTAE STRAIT,

    Plaintiff

v.

COMMISSIONER OF SOCIAL
SECURITY,

    Defendant.

_____/

Civil Action No.  18-12776

HON. NANCY G. EDMUNDS
U.S. District Judge
HON. R. STEVEN WHALEN
U.S. Magistrate Judge

## REPORT AND RECOMMENDATION

Plaintiff Shawntae Strait ("Plaintiff") brings this action under 42 U.S.C. § 405(g) challenging a final decision of Defendant Commissioner ("Defendant") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.  Plaintiff filed a motion to remand to the administrative level for further fact-finding or an award of benefits and Defendant filed a summary judgment motion, both of which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,  I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED and that Plaintiff's  Motion to Remand [Docket #15] be DENIED.

## I. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on December 9, 2015, alleging disability as of February 1, 2013 (Tr. 259). Upon initial denial of the claim, Plaintiff requested an administrative hearing, held on February 2, 2018 in Toledo, Ohio (Tr. 86). Administrative Law Judge ("ALJ") Richard Horowitz presided. Plaintiff, represented by John Morosi, testified by video conference (Tr. 93-126). Vocational Expert ("VE") Charles McGee also testified (Tr. 126-134). On March 20, 2018, ALJ Horowitz found that Plaintiff was not disabled (Tr. 12-24). On August 10, 2018, the Appeals Council denied review (Tr. 1-3). Plaintiff filed the present action in this Court on September 6, 2018.

## II. BACKGROUND FACTS

Plaintiff, born September 20, 1974, was 44 at the time of the administrative decision (Tr. 24, 259). She completed two years of college and worked previously as a daycare and home health aide provider (Tr. 284-285). She alleges disability due to monophobia, anxiety, autophobia, agoraphobia, and back, knee, and foot problems (Tr. 283).

### A. Plaintiff's Testimony

*Prior to the testimony, Plaintiff's counsel amended the alleged onset date to September 4, 2013* (Tr. 92).

Plaintiff offered the following testimony:

She lived in Bay City, Michigan with her husband and pets (Tr. 94). She was right-handed, stood 5' 5 ½", and weighed 228 pounds (Tr. 94). Her husband was collecting Social Security benefits (Tr. 94). She held a driver's license but did not drive more than three times a month (Tr. 95). She experienced anxiety driving since being involved in a bad car accident (Tr. 95). She completed two years of college but had not completed a degree (Tr. 96). She

completed the licensing requirements for CNA but the license expired in 2007 (Tr. 96).

Plaintiff was able to read and write (Tr. 96). She had not used a checkbook recently (Tr. 96). Before ceasing work, she worked as a daycare provider requiring lifting of up to 25 pounds (Tr. 96-97). She also had former work as a janitor which required her to lift up to 30 pounds (Tr. 97-98).

As of the amended onset of disability date, she experienced significant limitations due to a back injury (Tr. 98). Following the injury, she developed anxiety characterized by the dislike of being around others (Tr. 99). She experienced right shoulder problems at the same time as the back injury (Tr. 99). She admitted that she canceled physical therapy sessions prescribed for the shoulder injury (Tr. 99).

Plaintiff received treatment for depression and anxiety at "List Psychological" (Tr. 100). Her psychological problems were worsened by "financial stressors" due to her husband's disability (Tr. 100). Her condition improved with her financial condition but "went right back downhill again" when she began having renewed financial difficulty (Tr. 100). She attributed a gap in mental health treatment to financial problems (Tr. 101). She acknowledged that she and her husband took care of six dogs, noting that three of the dogs belonged to other family members (Tr. 102).

Plaintiff had trouble using the stairs and stopped performing yard work in July, 2017 after injuring her neck and shoulder in a car accident (Tr. 102, 112). She admitted that imaging studies of the neck and shoulders following the accident were unremarkable (Tr. 114). She performed household chores with the help of her daughter (Tr. 102). She acknowledged that in July, 2016, she started "walking and exercising" and cut her soda consumption from one case a day to one or two cans a day (Tr. 105). She acknowledged that she traveled in August, 2016 to visit her son in North Carolina and that she had been

discharged from mental health therapy the same month for ""symptom reduction" (Tr. 103).

Plaintiff acknowledged that prior to December, 2017 bariatric surgery she had been psychologically cleared for the operation (Tr. 105). A February, 2017 right foot strain had resolved (Tr. 106). She acknowledged that as of February, 2017 she was able to camp, watch television, use a computer, exercise, play electronic games, and read, but that her exercise was limited to "light cardio" (Tr. 106). She admitted that her anxiety increased at the time of family and housing problems (Tr. 107). She admitted that she traveled by herself to West Virginia in January, 2017 to pick up a friend (Tr. 108)

Plaintiff underwent four physical therapy sessions for shoulder and neck problems in the fall of 2017 (Tr. 108). The December, 2017 bariatric surgery was successful (Tr. 111). She was able to walk up to 100 feet, stand for 20 minutes, and sit for 45 (Tr. 115). She was limited to lifting 15 pounds and was unable to to push, pull, or perform postural activities (Tr. 116). She was unable to reach with her left arm but did not have problems with fine manipulations (Tr. 116). She shopped for groceries with her husband but experienced pain while walking through the store (Tr. 116). She did not have problems using the internet or experience problems sleeping (Tr. 117).

In response to questioning by her attorney, Plaintiff reported that she currently experienced panic attacks (Tr. 117). She experienced a panic attack the week before the hearing related to her father-in-law's health problems (Tr. 118). She experienced a couple of panic attacks each week brought about by discomfort in crowds (Tr. 118). She experienced problems concentrating (Tr. 119). She was able to focus on a television show if she was "actually paying attention" (Tr. 120). In August, 2015, she underwent surgery for a polycystic ovary (Tr. 120). The condition bothered her in the two years leading up to surgery but had resolved following surgery (Tr. 121). She had experienced a thyroid

condition for the last eight years and was scheduled for thyroid removal the following month (Tr. 121). The thyroid condition caused weight gain, hair loss, and fatigue (Tr. 122). The fatigue was characterized by falling asleep while watching television (Tr. 122). She had not taken medication for the thyroid problem (Tr. 122). She reiterated that due to the July, 2017 car accident that she experienced shoulder and neck pain and also experienced headaches (Tr. 123). She experienced irritable bowel syndrome ("IBS") between 2009 and the December, 2017 bariatric surgery (Tr. 124). She experienced incontinence when sneezing or coughing (Tr. 126).

### B. Medical Records

#### 1. Treating Records

September, 2013 treating records note that the conditions of stomach cramps and diarrhea were "much improved" (Tr. 411). December, 2013 imaging studies of the thyroid show that nodules on both sides of the thyroid were relatively stable (Tr. 447). Imaging studies of the right knee from the same month were unremarkable (Tr. 615). March, 2014 records state that Plaintiff was "going to the gym daily . . ." (Tr. 408). A July, 2014 MIR of the right shoulder showed mild osteoarthritis with tendinosis of the supraspinatus tendon (Tr. 445). In August, 2014, Plaintiff reported that physical therapy for the shoulder condition "did not work" (Tr. 404). Physical therapy notes state that Plaintiff "self-discharged" (Tr. 586). November, 2014 imaging studies showed a nodule of the right breast (Tr. 440).

March, 2015 records by Hurley Bariatric Center note that Plaintiff sought treatment options for morbid obesity (Tr. 368). She reported the conditions of asthma, gastroesophageal reflux disease ("GERD"), and sleep apnea (Tr. 368). She reported a past medical history of thyroid disease and ovarian cyst surgery (Tr. 368). Plaintiff reported the use of albuterol (Tr. 369). Treating records state that Plaintiff "[did] not seem to

acknowledge her role in her obesity" (Tr. 375). Gynological records from the same month note a history of ovarian cysts (Tr. 459). Plaintiff underwent surgery for a right ovarian cystic mass in August, 2015 (Tr. 451, 513, 516). Followup records note no post-surgical complications (Tr. 450). November, 2015 intake records by List Psychological Services note that Plaintiff exhibited a normal appearance and affect with full orientation but a "depressed/anxious/irritable mood (Tr. 389). She stated a goal of being able to go out in public by herself (Tr. 390).

In January, 2016, Plaintiff was advised to begin trial CPAP use (Tr. 500). The same month, counseling notes by Samantha Schalk, L.M.S.W. note Plaintiff's anxiety due to her husband's behavior (Tr. 717). February, 2016 emergency records note a diagnosis of kidney stones (Tr. 468). Plaintiff also sought treatment for dizziness (Tr. 476). Treating personnel noted a "completely negative workup" (Tr. 476). Her "pulse ox" measured at 100 percent (Tr. 476). The same month, a mammogram was negative for abnormalities (Tr. 620). Plaintiff reported stress due to her son's upcoming wedding reception (Tr. 721). A March, 2016 EKG was unremarkable (Tr. 617, 641). The same month she reported that the wedding reception went well but her anxiety was triggered by the behavior of family members (Tr. 723). June, 2016 counseling records note that Plaintiff reported reduced anxiety and better coping skills (Tr. 735-736). In August, 2016, Plaintiff reported a "good trip" with family where she was able to control her anxiety (Tr. 745). Plaintiff reported "significant" progress (Tr. 747).

In October, 2016, Plaintiff sought treatment for depression, "anxiety, and fears of being alone and anxiety in public places" (Tr. 653). She was diagnosed with a generalized anxiety disorder (Tr. 656). Intake records note that she exhibited good judgment, an appropriate affect, normal memory, good attention, and full orientation (Tr. 656). Plaintiff

reported that she was not working due to "anxiety and pain issues" (Tr. 657). She reported anxiety due to "family stressors and conflict" (Tr. 657). December, 2016 counseling records by Samantha Schalk note an anxious mood and appropriate appearance (Tr. 661). Plaintiff reported depression and anxiety to due family deaths and her husband's irritable mood (Tr. 663). Later the same month, Plaintiff reported "the worst anxiety attacks ever" due to arguments with her husband about bariatric surgery and car problems (Tr. 665).

In January, 2017, Plaintiff reported an unexplained panic attack following a solo trip to West Virginia through bad weather to pick up a friend (Tr. 667). Treatment records related to preparation for bariatric surgery note that Plaintiff was instructed to go to the gym 5 days a week (Tr. 873). Schalk composed a letter on behalf of Plaintiff's request for bariatric surgery, noting that Plaintiff sought psychological treatment due to the death of her father and was "motivated for change" (Tr. 915). Plaintiff reported the recreational activities of hunting, fishing or camping, watching television, using the computer, exercising regularly, video games, and reading (Tr. 923). She reported close relationships with friends and family (Tr. 925). She reported that she felt "tired" and "content" most of the time (Tr. 926). Later the same month, Plaintiff reported continued conflicts with her husband (Tr. 669). The same month, Plaintiff sought emergency treatment for a "pop" in her right foot (Tr. 769). She denied knee pain (Tr. 769). She was diagnosed with a right foot sprain (Tr. 770). A CT scan showed a "tiny" spur on the right ankle (Tr. 776).

The following month, Plaintiff reported lessened anxiety as her relationship with her husband improved but in March, 2017, reported "anxiety attacks almost every single night because of [her husband]" (Tr. 671, 673). The following month, Plaintiff reported continued anxiety due to her in-laws' behavior and painful warts on her feet (Tr. 677). Imaging studies showed a growth in a left-sided thyroid nodule (Tr. 707, 782). In May, 2017 she reported

that her "nerves" were bad due to the use of drugs by her sister (Tr. 679). Plaintiff reported "a massive panic attack" at her doctor's office (Tr. 681). In July, 2017, Plaintiff sought emergency treatment for neck pain following a car accident (Tr. 788). She appeared fully oriented with a normal mood and affect (Tr. 789). Imaging studies of the cervical spine were unremarkable (Tr. 797). An imaging study of the left shoulder was also unremarkable (Tr. 799-800). Counseling records from the same month note continued stress resulting from family conflicts (Tr. 1038). The following month, she reported stress after her house was flooded (Tr. 1044). In October, 2017, she reported that a trip to visit her son in North Carolina with her family was exhausting and stressful (Tr. 1048).

In November, 2017, Plaintiff reported mild pain, infrequent headaches, good concentration, only slight pain while driving, and the ability to lift heavy weights and engage in recreational activities (albeit with pain) (Tr. 802). She reported body aches the day after cleaning her daughter's house (Tr. 817). The same month, Plaintiff reported three panic attacks in one week after receiving news that she would require the biopsy of a thyroid nodule (Tr. 1052). In December, 2017, Plaintiff underwent laparoscopic vertical sleeve gastrectomy (bariatric surgery) (Tr. 831). Counseling records from the same month note good results from the surgery with rapid weight loss (Tr. 1056).

In January, 2018, Schalk completed a mental health assessment, finding that due to generalized anxiety, headaches, neuropathy, and back, shoulder, neck problems, Plaintiff would miss work more than three times a month (Tr. 1065, 1067). Schalk found that Plaintiff experienced marked limitation in activities of daily living and concentration, persistence, or pace; extreme limitation in social functioning; and one or two episodes of decompensation each year (Tr. 1068). She found marked limitation in maintaining concentration, working within a schedule, completing a normal workweek without psychologically based

interruptions, interacting with the public, and responding appropriately to workplace changes (Tr. 1069-70). The same month Scott Baker, M.D. examined Plaintiff in preparation for the removal of the thyroid, noting a "normal and appropriate" mood and affect (Tr. 1075).

### 2. Consultative and Non-Examining Sources

A January, 2015 psychological evaluation was performed "to assess [Plaintiff's] motivation to undergo Bariatric surgery" (Tr. 464). Plaintiff denied current symptoms of depression (Tr. 466). She exhibited a normal posture and gait (Tr. 466). Nathalie Menendes, Psy. D. observed a "cooperative, calm, and friendly" manner with contact with reality, and a "spontaneous, logical, and organized" thought process (Tr. 466). Dr. Menendes noted that Plaintiff's profile "indicates she is free of disabling psychopathology" (Tr. 466).

In April, 2016, Mark Zaroff, Ph.D. performed a consultative psychological examination on behalf of the SSA, noting Plaintiff's report of depression since her mother died of cancer 15 years earlier (Tr. 622). Plaintiff also reported anxiety characterized by flushing, tachycardia, and a choking sensation (Tr. 622). She reported that she no longer drove (Tr. 622).

Dr. Zaroff noted that a pre-surgical psychological evaluation "did not reveal any significant psychopathology" which Plaintiff explained was because "she has had periods of stability" but that her condition was generally worsening (Tr. 622). She reported that she had not received psychological treatment for over three years because she "ran out of insurance" (Tr. 623). Plaintiff stated that she had a good relationship with her husband, children, and siblings (Tr. 624). She and her husband took care of their six dogs, and Plaintiff's activities included laundry, dishes, and yard work (Tr. 624). Plaintiff appeared well groomed, attentive, and calm with good hygiene (Tr. 624). Dr. Zaroff noted fair to poor self esteem with low motivation (Tr. 624). Her speech was "logical, organized, and goal directed" (Tr.

624). While Plaintiff reported ongoing depression, her affect was normal (Tr. 625). Dr. Zaroff found that Plaintiff's depression was "recurrent, mild" with panic attacks (Tr. 626). He noted that Plaintiff could "handle multiple step tasks" and "moderately complex information" (Tr. 626).

The following month, Robert Newhouse, M.D. found mild limitation in activities of daily living and concentration, persistence, or pace, and moderate difficulty in social functioning (Tr. 153). He concluded Plaintiff was "able to do simple and some more complex tasks but would function best in small familiar groups" (Tr. 159).      .

### C. VE Testimony

VE McBee stated that his testimony would reflect the information found in the *Dictionary of Occupational Titles,* (*"DOT"*) unless otherwise noted (Tr. 127). He classified Plaintiff's past relevant work as a child monitor as semiskilled and exertionally medium and work as an industrial cleaner unskilled and medium[1] (Tr. 128). The ALJ then posed the following question, describing a hypothetical individual of Plaintiff's age, education, and work experience:

> [C]an occasionally use right-hand and right-foot controls; can reach overhead with both arms occasionally and reach in all other directions with both arms frequently; can occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; and can occasionally balance, stoop, kneel, crouch, or crawl; never work around hazards, such as at unprotected heights or around moving mechanical parts; can occasionally operate a motor vehicle and occasionally work in conditions of humidity and wetness, extreme heat or cold,

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds.

and conditions where there are concentrated vibrations and in conditions where there's concentrated exposure to dust, odors, fumes, or other pulmonary irritants; also limited to performing simple, routine, and repetitive tasks but not at a production rate pace -- for example, no assembly line or conveyor belt work; limited to simple, work-related decisions; can respond appropriately to occasional interaction with supervisors and coworkers but with no team or tandem work with coworkers and no interaction with the general public; limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; any necessary changes need to occur infrequently and be adequately and easily explained (Tr. 129).

Based on the hypothetical limitations, the VE found that the individual would be unable to perform Plaintiff's past relevant work, but could perform the light, unskilled work of a merchandise marker (283,000 in the national economy); sorter (50,000); and photocopy machine operator (45,000), as well as the *sedentary* work of an address clerk (60,000); document preparer (100,000); and surveillance monitor (90,000) (Tr. 130-131).

The VE testified that the need to miss more than one day of work each month, or be off task for than 10 percent or more of the workday, would be work preclusive (Tr. 131-132). He stated that the need to recline for any portion of the workday would also be work preclusive (Tr. 132). He stated that his testimony was consistent with the information found in the *DOT* as well as the "standard practices of human resource managers throughout the United States with regards to off-task behavior, breaks, and absenteeism" (Tr. 132-133). He stated that his testimony regarding overhead reaching was based on his own professional experience (Tr. 133). In response to questioning by Plaintiff's attorney, the VE stated that if the individual were unable to be in proximity to other coworkers, the above jobs would be unavailable (Tr. 134). He testified in addition that if the same individual were wholly unable to interact with supervisors, all work would be precluded (Tr. 134).

### D. The ALJ's Decision

Citing the medical records, ALJ Horowitz found that Plaintiff experienced the severe impairment of "obesity status post gastric bypass surgery, mild osteoarthritis of the right shoulder AC joint with tendinosis, asthma, multi-nodular goiter/thyroid nodules, and mental impairments variously described as depression and anxiety," but that none of the conditions met or medically equaled an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 15). The ALJ found that the impairments of hiatal hernia status post repair, right foot problems, ovarian mass, kidney stones, right breast fibroadenoma, cervical strain, GERD, and obstructive sleep apnea were non-severe (Tr. 15). He found that Plaintiff experienced moderate limitation in understanding, remembering, or applying information; interacting with others; concentration, persistence, or pace; and adapting or managing herself (Tr. 15-16).

The ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") for light work with the following additional limitations:

> [O]ccasionally use right hand and right foot controls; reach overhead with both arms occasionally and reach in all other directions with both arms frequently; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, or crawl; never work around hazards, such as at unprotected heights or around moving mechanical parts; occasionally operate a motor vehicle; occasionally work in conditions of humidity and wetness, in extreme heat or cold, in conditions where there are concentrated vibrations, and in conditions where there is concentrated exposure to dust, odors, fumes, or other pulmonary irritants; limited to performing simple, routine, and repetitive tasks, but not at a production rate pace, for example, no assembly line or conveyor belt work; limited to simple work-related decisions; can respond appropriately to occasional interaction with supervisors and coworkers, but with no team or tandem work with coworkers, and no interaction with the general public; limited to tolerating few changes in the work setting, defined as routine job duties that remain static and are performed in a stable, predictable work setting; any necessary changes need to occur infrequently, and be adequately and easily explained.
> (Tr. 17).

Citing the VE's testimony, the ALJ found that while Plaintiff was unable to perform her past relevant work, she could perform the light, unskilled work of a merchandise marker, sorter, and photocopy machine operator (Tr. 23, 130).

The ALJ discounted the alleged degree of physical and psychological limitation, noting that while Plaintiff had an asthma exacerbation in August, 2014, it improved with the use of Pro Air and that a February, 2016 test showed 100 percent pulse oximetry (Tr.19). He observed that as of July, 2016, Plaintiff was "exercising, walking, and losing weight" (Tr. 19). He noted that mental status examinations showed normal motor activity, good judgment, an appropriate affect, and full orientation (Tr. 19). He cited treating records noting that her anxiety was quelled when her relationship with her husband improved (Tr. 19). He noted that she had been psychologically cleared for bariatric surgery (Tr. 19). The ALJ cited Dr. Zaroff's comment that Plaintiff denied mental health treatment from October, 2012 until a few months before the April, 2016 consultative examination (Tr. 19).

### III. STANDARD OF REVIEW

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficien[t] evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, — U.S. —, 139 S.Ct. 1148, 1154 (2019)(punctuation altered)(*citing Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938))(emphasis deleted). The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence. *Biestek* at 139 S. Ct. at1152; 42 U.S.C. §405(g). "Substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)(*citing Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d

284, 286 (6th Cir.1994)).

The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(*en banc*). Where substantial evidence supports the ALJ's decision, the reviewing court "defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Commissioner Of Social Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)(*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)). However, in determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## IV. FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## V.  ANALYSIS

In her sole argument for remand, Plaintiff contends that the RFC for a limited range of exertionally light, unskilled work is not supported by substantial evidence. *Plaintiff's Brief,* 13-16, *Docket #15*, Pg ID 1146.  Specifically, she faults the ALJ's rejection of social worker/mental health counselor Schalk's January, 2018 assessment reflecting disability level psychological limitation. *Id.* at 15; (Tr. 1065-69).  Plaintiff points out that Schalk's finding of at least two "marked" functional limitations, if adopted, would result in a disability finding at Step Three of the administrative analysis. *Id.* at 16.

At Step Three of the sequential analysis, a finding of two marked limitation in the three categories of (1) daily living (2) social functioning, and (3) moderate limitation in concentration, persistence, or pace, or, a finding of extreme limitation in one category resulting from the conditions of either depression or anxiety would direct a finding of disability.  *See* 20 CF.R. Part 404, Subpart P, Appendix 1 §§ 12.04(B), 12.06(B).  As such, Schalk's finding that Plaintiff experienced marked limitation in activities of daily living and concentration, persistence, or pace and extreme limitation in social functioning is consistent with a disability determination at Step Three (Tr. 1068).

As a threshold matter, because Schalk was a social worker and not an acceptable medical source, the ALJ was not required to accord controlling weight to her January, 2018 assessment.  *See* SSR 06–03p, 2006 WL 2329939, at *2 (August 9, 2006)(only acceptable

medical sources - physicians, licensed or certified psychologist, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists entitled to controlling weight). In contrast, opinions by "other" sources, are entitled to "consideration" along with "all relevant evidence in the case record" in making the disability determination. *Id.* at *4. *Cole v. Astrue*, 661 F.3d 931, 939 (6th Cir. 2011)(treating social worker's opinion "entitled to consideration").

The ALJ explained his reasons for according "little weight" to Schalk's assessment, observing that the treating records showed "stable mental functioning" (Tr. 20-21). He noted that Schalk's own treating notes characterized the psychological limitations as "moderate" (Tr. 21, 716, 718). While Plaintiff cites Schalk's treating records restating the allegations of extreme limitation (occurring outside the clinical setting), the ALJ did not err in noting that the Schalk's records also contained evidence showing a lessor degree of limitation. *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 378 (6th Cir.2013)(ALJ did not err in discounting therapist's opinion based on subjective claims); 20 C.F.R. § 404.1527(c)(3)). Accordingly, the ALJ fulfilled the procedural and substantive requirements of considering the opinion by an "other" source under SSR 06-03p.

Other opinion evidence supports the non-disability finding. The ALJ cited Dr. Zaroff's finding that Plaintiff was capable of processing "moderately complex information" but nonetheless limited her to unskilled work in recognition of some evidence of "situational" depression and anxiety (Tr. 20, 626). A non-examining review of Plaintiff's records performed the month after Dr. Zaroff's examination found moderate limitations in social functioning but otherwise mild psychological limitation (Tr. 153). The ALJ noted that while Plaintiff alleged that she was mentally incapable of working in her quest for disability benefits, a psychological evaluation to determine whether she a good candidate for bariatric

surgery concluded that she was "free of disabling psychopathology" (Tr. 466). The same evaluation noted that Plaintiff denied depression and had a "cooperative, calm, and friendly" manner (Tr. 466). Plaintiff's claims to Schalk of frequent and debilitating panic attacks are undermined by the other treating, examining, and non-examining findings.

The ALJ's determination that Plaintiff did not experience more than moderate psychological limitation is otherwise well supported (Tr. 15-16). The ALJ noted that Plaintiff's regular activities included doing laundry, taking care of the family's dogs, handling financial matters, and reading (Tr. 16). The ALJ observed that she could grocery shop and walk her dogs "which reasonably expose[d] her to the public," contrary to the allegations of extreme anxiety in public places (Tr. 16). He noted that she communicated with others by phone and computer (Tr. 16-17). The ALJ found a "strong ability to concentrate, persist, and maintain pace," citing the mental status exams "show[ing] largely benign findings" (Tr. 17, 19). The ALJ noted that Plaintiff's allegations of disabling agoraphobia and the fear of being alone were also undermined by her family vacation to North Carolina in August, 2016 and the ability drive by herself to West Virginia in January, 2017 to pick up a friend (Tr. 20).

Plaintiff's additional scattershot criticisms of the RFC do not provide grounds for remand. She contends that the restriction to "simple" tasks does not account for absenteeism due to panic attacks. *Plaintiff's Brief* at 16. However, the RFC accounted for the allegations of anxiety by further limiting her to "occasional interaction with supervisors and coworkers;" "no team or tandem work with coworkers;" "no interaction with the general public;" "few changes in the work setting;" and "a stable, predictable work setting" (Tr. 17). Plaintiff's ability to travel out of state by herself, go to the gym, walk the dogs, and exhibit appropriate behavior at treating and consultative examinations supports the finding that she could work

-17-

within the parameters of the RFC. For overlapping reasons, Plaintiff's ability to exercise daily, travel, plan social events, and perform household chores on a regular basis undermines her claim that a thyroid imbalance caused disabling fatigue. *Plaintiff's Brief* at 16; (Tr. 105, 108, 408, 624, 721, 723, 745, 802, 817, 923).

Because the ALJ's determination that Plaintiff is not disabled is well within the "zone of choice" accorded to the fact-finder at the administrative hearing level, I recommend that the administrative findings remain undisturbed. *Mullen v. Bowen, supra.*

## VI. CONCLUSION

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment [Docket #17] be GRANTED and that Plaintiff's Motion to Remand [Docket #15] be DENIED.

Any objections to this Report and Recommendation must be filed within 14 days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987).

Any objections must be labeled as "Objection #1," "Objection #2," etc., and any objection must recite *precisely* the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party must file

a concise response proportionate to the objections in length and complexity. The response must specifically address each issue raised in the objections, in the same order and labeled as "Response to Objection #1," "Response to Objection #2," *etc.*

s/R. Steven Whalen<br>
R. STEVEN WHALEN<br>
UNITED STATES MAGISTRATE JUDGE

Dated: August 15, 2019

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on August 17, 2015, by electronic means and/or ordinary mail.

s/H. Monda in the absence of C. Ciesla<br>
Case Manager